1
2
3
4
5
6
7
8                UNITED STATES DISTRICT COURT
9            CENTRAL DISTRICT OF CALIFORNIA
10

| | | |
|---|---|---|
| 11 Judith O. Hollinger, | ) | CV 12-396 RSWL (MRWx) |
| 12            Plaintiff, | ) ) | |
| 13     vs. | ) ) | **STATEMENT OF UNCONTROVERTED** |
| 14 | ) ) | **FACTS AND CONCLUSIONS OF LAW** Re: Defendant |
| 15 California Physicians' | ) ) | California Physicians' Service d.b.a. Blue |
| 16 Service d.b.a. Blue Shield of California et al., | ) ) | Shield of California [27] |
| 17 | ) ) | |
| 18            Defendants. | ) ) | |

19      After consideration of Defendant California

20 Physicians' Service d.b.a. Blue Shield of California

21 [27], this Court makes the following findings of fact

22 and conclusions of law:

23               <u>**UNCONTROVERTED FACTS**</u>

24      1.  Plaintiff Judith Hollinger ("Plaintiff") is the

25 widow of Dr. Glen Hollinger ("Dr. Hollinger"), who died

26 on August 17, 2010, after battling cancer.  Def. Blue

27 Shield's Stmt. of Uncontroverted Facts and Conclusions

28 of Law ("Blue Shield SUF") ¶ 3.

                                1

2.  Dr. Hollinger was the Chief Medical Officer of
Good Samaritan Medical Practice Association, Inc.
("GSMPA"), which is an Independent Physicians
Association.  Id. ¶ 1.

3.  As a physician with Good Samaritan Hospital,
Dr. Hollinger received health coverage under a Blue
Shield Large Group HMO Plan ("the Plan").  Id. ¶ 2.

4.  Dr. Hollinger selected GSMPA as his primary
medical group under the Plan.  Administrative Record
("AR") at 770.

5.  Defendant Advanced Medical Managment, Inc.
("AMM") is a medical services organization that
provided management and administrative services to
Defendant GSMPA.  Def. AMM's Stmt. of Uncontroverted
Facts and Conclusions of Law ("AMM SUF") ¶ 1.

6.  In February 2010, Dr. Hollinger was referred to
Excel Diagnostics in Houston, Texas, for cancer
treatment involving high dose Indium-III Octreotide
therapy.  Blue Shield SUF ¶ 12.

7.  Excel Diagnostics began administering treatment
in March 2010.  Id. ¶ 13.

8.  Initially, Dr. Hollinger paid in cash for the
first round of treatment, but then asked sometime in
June 2010 that GSMPA assist him with obtaining approval
and payment for subsequent treatment from Blue Shield.
Id. ¶¶ 16, 33.

9.  Under the Plan, coverage was only available for
"medically necessary services," which are defined as:

1          [T]hose which have been established as safe and

2          effective and are furnished in accordance with

3          generally accepted professional standards to

4          treat an illness, injury, or medical condition,

5          and which, as determined by Blue Shield, are:

6          (a) consistent with Blue Shield medical policy;

7          and

8          (b) consistent with the symptoms or diagnosis;

9          and

10         (c) not furnished primarily for the convenience

11         of the patient, attending Physician or other

12         provider; and,

13         (d) furnished at the most appropriate level

14         which can be provided safely and effectively to

15         the patient.

16 Id. ¶ 5.

17    10.   The Plan stated that the medical group or Blue

18 Shield determined whether services are medically

19 necessary.   Id. ¶ 6.

20    11.   The Plan did not cover medical services that

21 were "experimental or investigational in nature," which

22 are defined as those treatments "which are not

23 recognized in accordance with generally accepted

24 professional medical standards as being safe and

25 effective for use in the treatment of the illness,

26 injury, or condition at issue." Id. ¶¶ 7-8.

27    12.   The Plan also covered therapy provided as part

28 of a clinical trial for cancer.  Id. ¶ 10.

13.    Under the Plan:

An approved clinical trial is limited to a trial that is:

1.   Approved by one of the following:

a.   one of the National Institutes of Health;

b.   the federal Food and Drug Administration, in the form of an investigational new drug application;

c.   the United States Department of Defense;

d.   the United States Veterans Administration; or

2.   Involves a drug that is exempt under federal regulations from a new drug application.

Id. ¶ 11.

14.    The Plan states that in order to receive coverage for participation in a clinical trial (1) the member's Personal Physician must obtain prior authorization and (2) the member has to be accepted into an approved clinical trial for cancer provided that:

1.   the clinical trial has a therapeutic intent and the Member's treating Physician determines that participation in the clinical trial has a meaningful potential to benefit the Member with a therapeutic

4

intent; and

2.    the Member's treating Physician recommends participation in the clinical trial; and

3.    the Hospital and/or Physician conducting the clinical trial is a Plan Provider, unless the protocol for the trial is not available through a Plan Provider.

Id. ¶ 10.

15.   Under the Plan, Blue Shield was responsible for the costs of the clinical trials and for determining coverage.  AR at 359, 386 ("Decision making for cancer clinical trial coverage . . . is Blue Shield's responsibility and is **not delegated** to IPA/medical groups.") (emphasis in original).

16.   Further, the Plan states that "Blue Shield shall have the power and discretionary authority to construe and interpret the provisions of the Contract, and determine eligibility to receive benefits under the Contract."  Blue Shield SUF ¶ 39.

17.   In 2010, on several occasions, Blue Shield and GSMPA contacted Excel Diagnostics to obtain documentation to confirm whether Dr. Hollinger was enrolled in a clinical trial.  Id. ¶ 17.

18.   On September 8, 2010, after Dr. Hollinger passed away, Dr. Delpassand provided a letter ("September 8, 2010 Letter") stating,

Dr. Glen Hollinger was referred to Excel Diagnostics in February of 2010 for

consideration in enrolling in clinical trial

IND # 72,037 approved by the FDA.

AR at 181.

19.  Dr. Delpassand's letter also included an attachment documenting an exam from March 5, 2010, stating that Dr. Hollinger "met the inclusion and exclusion criteria for the clinical trial."  AR at 182.

20.  Further, the attachment indicated that Dr. Hollinger had a Karnofsky score of 75.  Id.

21.  The Karnofsky Performance Scale Index classifies patients according to their functional impairment.  AR at 485.

22.  A low Karnofsky score indicates a low level of survival for serious illnesses.  Id.

23.  Later, after reviewing Dr. Delpassand's September 8, 2010 Letter, Dr. David Ormerod, a Blue Shield Senior Medical Director and physician who was reviewing Dr. Hollinger's case, sent an email dated November 4, 2010, to Plaintiff's attorney which listed missing information that Excel Diagnostics had yet to provide, including documentation of their protocol, including exclusion and inclusion criteria.  AR at 42.

24.  Dr. Ormerod indicated in his email that based on information he was able to find over the Internet, he did not believe that Dr. Hollinger met the inclusion and exclusion criteria for the clinical trial.  Id.

25.  His conclusion was based on reports that prior to Dr. Hollinger's first course of treatment, he could

no longer stand or walk and was at risk of spinal cord compression.  Blue Shield SUF ¶ 24.

26.   In the email, Dr. Ormerod requested further documentation regarding Dr. Hollinger's physical exam with Excel Diagnostics to determine whether Dr. Hollinger was physically qualified for enrollment in a clinical trial.  <u>Id.</u> ¶ 25.

27.   Blue Shield did not arrive at a final determination of coverage.  <u>Id.</u> ¶ 26.

28.   After Dr. Hollinger passed away in August 2010, Plaintiff's counsel sent a "Formal Request for Retroactive Authorization of Treatment" to GSMPA on September 26, 2011.  <u>Id.</u> ¶ 27.

29.   On October 18, 2011, GSMPA denied the request. <u>Id.</u> ¶ 28.

30.   GSMPA's denial letter stated that GSMPA determined that Dr. Hollinger's treatment was not medically necessary and that the "services [Dr. Hollinger] received were not authorized because it was determined at the time services were rendered that [Dr. Hollinger's] medical condition did not meet the qualifications for the clinical trial and the study was full."  AR at 223.

31.   The letter stated that the determination was based on Dr. Hollinger's medical records and clinical history.  <u>Id.</u>

32.   On November 3, 2011, Plaintiff filed an appeal with Blue Shield.  Blue Shield SUF ¶ 30.

33.   Blue Shield conducted a review of Plaintiff's appeal, and had the claim reviewed by a Blue Shield Medical Director, an independent physician consultant who was board certified in hematology/oncology, and a Registered Nurse.  Id. ¶ 32.

34.   Blue Shield evaluated the question of coverage based on its standard policies and procedures relating to medical necessity and experimental treatments, and referred the matter to an independent medical reviewer. Id. ¶ 34.

35.   The independent reviewer determined that the treatment was experimental, and not medically necessary based on the Plan's criteria.  Id. ¶¶ 35-37.

36.   Thus, Blue Shield denied Plaintiff's appeal. Id. ¶ 37.

## CONCLUSIONS OF LAW

1.   A challenge to an ERISA plan's denial of benefits is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

2.   If a plan does grant such discretion, a reviewing court applies an "abuse of discretion" or-- what amounts to the same thing--an "arbitrary and capricious" standard.  See Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1471 n. 2 (9th Cir. 1994).

1    3.    The Plan explicitly grants discretion to Blue

2    Shield to determine benefits and interpret the Plan, so

3    the appropriate review is abuse of discretion.

4    4.    In situations where "a plan administrator

5    denies benefits and (1) the wording of the plan confers

6    discretion on the plan administrator and (2) the plan

7    administrator has a conflict of interest," a court

8    should apply an "abuse of discretion review, tempered

9    by skepticism commensurate with the plan

10   administrator's conflict of interest." Abatie v. Alta

11   Health & Life Ins. Co., 458 F.3d 955, 959 (9th Cir.

12   2006) (en banc).

13   5.    When adjudicating a claim for benefits, ERISA

14   administrators have a duty to adequately investigate

15   the claim. Booton v. Lockheed Medical Benefit Plan,

16   110 F.3d 1461, 1463 (1997).

17   6.    The plan administrator must engage in

18   "meaningful dialogue" with the beneficiary. Id.

19   7.    "If the administrator believes more information

20   is needed to make a reasoned decision, they must ask

21   for it." Id.; see also Kunin v. Benefit Trust Life Ins.

22   Co., 910 F.2d 534, 538 (9th Cir. 1990) (burden is on

23   the administrator to obtain information to make

24   decision).

25   8.    Because Blue Shield did not adequately perform

26   its investigation, the Court views Blue Shield's

27   decision with skepticism.

28   9.    Blue Shield abused its discretion by failing to

adequately to consider Dr. Hollinger's eligibility for a clinical trial for cancer.

10. Remand to the plan administrator is appropriate when it is unclear whether the beneficiary is entitled to benefits. See, e.g., Love v. Nat'l City Corp. Welfare Benefits Plan, 574 F.3d 392, 398 (7th Cir. 2009).

11. The Court finds that it is unclear whether Dr. Hollinger was qualified for a clinical trial under the Plan, and therefore remands to Blue Shield for further proceedings.

**IT IS SO ORDERED.**

DATED: December 11, 2012.

RONALD S.W. LEW

**HONORABLE RONALD S.W. LEW**

Senior, U.S. District Court Judge