UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Judith O. Hollinger,<br><br>              Plaintiff,<br><br>  vs.<br><br>California Physicians'<br>Service d.b.a. Blue Shield<br>of California et al.,<br><br>             Defendants. | CV 12-396 RSWL (MRWx)<br><br>**STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW** Re: Defendant California Physicians' Service d.b.a. Blue Shield of California [27] |

After consideration of Defendant California Physicians' Service d.b.a. Blue Shield of California [27], this Court makes the following findings of fact and conclusions of law:

### UNCONTROVERTED FACTS

1. Plaintiff Judith Hollinger ("Plaintiff") is the widow of Dr. Glen Hollinger ("Dr. Hollinger"), who died on August 17, 2010, after battling cancer. Def. Blue Shield's Stmt. of Uncontroverted Facts and Conclusions of Law ("Blue Shield SUF") ¶ 3.

1

2.   Dr. Hollinger was the Chief Medical Officer of Good Samaritan Medical Practice Association, Inc. ("GSMPA"), which is an Independent Physicians Association.  Id. ¶ 1.

3.   As a physician with Good Samaritan Hospital, Dr. Hollinger received health coverage under a Blue Shield Large Group HMO Plan ("the Plan").  Id. ¶ 2.

4.   Dr. Hollinger selected GSMPA as his primary medical group under the Plan.  Administrative Record ("AR") at 770.

5.   Defendant Advanced Medical Managment, Inc. ("AMM") is a medical services organization that provided management and administrative services to Defendant GSMPA.  Def. AMM's Stmt. of Uncontroverted Facts and Conclusions of Law ("AMM SUF") ¶ 1.

6.   In February 2010, Dr. Hollinger was referred to Excel Diagnostics in Houston, Texas, for cancer treatment involving high dose Indium-III Octreotide therapy.  Blue Shield SUF ¶ 12.

7.   Excel Diagnostics began administering treatment in March 2010.  Id. ¶ 13.

8.   Initially, Dr. Hollinger paid in cash for the first round of treatment, but then asked sometime in June 2010 that GSMPA assist him with obtaining approval and payment for subsequent treatment from Blue Shield.  Id. ¶¶ 16, 33.

9.   Under the Plan, coverage was only available for "medically necessary services," which are defined as:

|   |   |
|---|---|
| 1 | [T]hose which have been established as safe and |
| 2 | effective and are furnished in accordance with |
| 3 | generally accepted professional standards to |
| 4 | treat an illness, injury, or medical condition, |
| 5 | and which, as determined by Blue Shield, are: |
| 6 | (a) consistent with Blue Shield medical policy; |
| 7 | and |
| 8 | (b) consistent with the symptoms or diagnosis; |
| 9 | and |
| 10 | (c) not furnished primarily for the convenience |
| 11 | of the patient, attending Physician or other |
| 12 | provider; and, |
| 13 | (d) furnished at the most appropriate level |
| 14 | which can be provided safely and effectively to |
| 15 | the patient. |

16  Id. ¶ 5.

17      10.  The Plan stated that the medical group or Blue
18  Shield determined whether services are medically
19  necessary.  Id. ¶ 6.

20      11.  The Plan did not cover medical services that
21  were "experimental or investigational in nature," which
22  are defined as those treatments "which are not
23  recognized in accordance with generally accepted
24  professional medical standards as being safe and
25  effective for use in the treatment of the illness,
26  injury, or condition at issue."  Id. ¶¶ 7-8.

27      12.  The Plan also covered therapy provided as part
28  of a clinical trial for cancer.  Id. ¶ 10.

13. Under the Plan:
    An approved clinical trial is limited to a trial that is:
    1. Approved by one of the following:
        a. one of the National Institutes of Health;
        b. the federal Food and Drug Administration, in the form of an investigational new drug application;
        c. the United States Department of Defense;
        d. the United States Veterans Administration; or
    2. Involves a drug that is exempt under federal regulations from a new drug application.

Id. ¶ 11.

14. The Plan states that in order to receive coverage for participation in a clinical trial (1) the member's Personal Physician must obtain prior authorization and (2) the member has to be accepted into an approved clinical trial for cancer provided that:
    1. the clinical trial has a therapeutic intent and the Member's treating Physician determines that participation in the clinical trial has a meaningful potential to benefit the Member with a therapeutic

1                     intent; and
2           2.   the Member's treating Physician recommends
3                participation in the clinical trial; and
4           3.   the Hospital and/or Physician conducting
5                the clinical trial is a Plan Provider,
6                unless the protocol for the trial is not
7                available through a Plan Provider.
8 Id. ¶ 10.
9     15.   Under the Plan, Blue Shield was responsible
10 for the costs of the clinical trials and for
11 determining coverage. AR at 359, 386 ("Decision making
12 for cancer clinical trial coverage . . . is Blue
13 Shield's responsibility and is **not delegated** to
14 IPA/medical groups.") (emphasis in original).
15     16.   Further, the Plan states that "Blue Shield
16 shall have the power and discretionary authority to
17 construe and interpret the provisions of the Contract,
18 and determine eligibility to receive benefits under the
19 Contract." Blue Shield SUF ¶ 39.
20     17.   In 2010, on several occasions, Blue Shield and
21 GSMPA contacted Excel Diagnostics to obtain
22 documentation to confirm whether Dr. Hollinger was
23 enrolled in a clinical trial. Id. ¶ 17.
24     18.   On September 8, 2010, after Dr. Hollinger
25 passed away, Dr. Delpassand provided a letter
26 ("September 8, 2010 Letter") stating,
27         Dr. Glen Hollinger was referred to Excel
28         Diagnostics in February of 2010 for

```
                consideration in enrolling in clinical trial
                IND # 72,037 approved by the FDA.
AR at 181.
     19.  Dr. Delpassand's letter also included an
attachment documenting an exam from March 5, 2010,
stating that Dr. Hollinger "met the inclusion and
exclusion criteria for the clinical trial."  AR at 182.
     20.  Further, the attachment indicated that Dr.
Hollinger had a Karnofsky score of 75.  Id.
     21.  The Karnofsky Performance Scale Index
classifies patients according to their functional
impairment.  AR at 485.
     22.  A low Karnofsky score indicates a low level of
survival for serious illnesses.  Id.
     23.  Later, after reviewing Dr. Delpassand's
September 8, 2010 Letter, Dr. David Ormerod, a Blue
Shield Senior Medical Director and physician who was
reviewing Dr. Hollinger's case, sent an email dated
November 4, 2010, to Plaintiff's attorney which listed
missing information that Excel Diagnostics had yet to
provide, including documentation of their protocol,
including exclusion and inclusion criteria.  AR at 42.
     24.  Dr. Ormerod indicated in his email that based
on information he was able to find over the Internet,
he did not believe that Dr. Hollinger met the inclusion
and exclusion criteria for the clinical trial.  Id.
     25.  His conclusion was based on reports that prior
to Dr. Hollinger's first course of treatment, he could
```

1  no longer stand or walk and was at risk of spinal cord
2  compression.  Blue Shield SUF ¶ 24.
3       26.  In the email, Dr. Ormerod requested further
4  documentation regarding Dr. Hollinger's physical exam
5  with Excel Diagnostics to determine whether Dr.
6  Hollinger was physically qualified for enrollment in a
7  clinical trial.  Id. ¶ 25.
8       27.  Blue Shield did not arrive at a final
9  determination of coverage.  Id. ¶ 26.
10      28.  After Dr. Hollinger passed away in August
11 2010, Plaintiff's counsel sent a "Formal Request for
12 Retroactive Authorization of Treatment" to GSMPA on
13 September 26, 2011.  Id. ¶ 27.
14      29.  On October 18, 2011, GSMPA denied the request.
15 Id. ¶ 28.
16      30.  GSMPA's denial letter stated that GSMPA
17 determined that Dr. Hollinger's treatment was not
18 medically necessary and that the "services [Dr.
19 Hollinger] received were not authorized because it was
20 determined at the time services were rendered that [Dr.
21 Hollinger's] medical condition did not meet the
22 qualifications for the clinical trial and the study was
23 full."  AR at 223.
24      31.  The letter stated that the determination was
25 based on Dr. Hollinger's medical records and clinical
26 history.  Id.
27      32.  On November 3, 2011, Plaintiff filed an appeal
28 with Blue Shield.  Blue Shield SUF ¶ 30.

33. Blue Shield conducted a review of Plaintiff's appeal, and had the claim reviewed by a Blue Shield Medical Director, an independent physician consultant who was board certified in hematology/oncology, and a Registered Nurse. Id. ¶ 32.

34. Blue Shield evaluated the question of coverage based on its standard policies and procedures relating to medical necessity and experimental treatments, and referred the matter to an independent medical reviewer. Id. ¶ 34.

35. The independent reviewer determined that the treatment was experimental, and not medically necessary based on the Plan's criteria. Id. ¶¶ 35-37.

36. Thus, Blue Shield denied Plaintiff's appeal. Id. ¶ 37.

## CONCLUSIONS OF LAW

1. A challenge to an ERISA plan's denial of benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

2. If a plan does grant such discretion, a reviewing court applies an "abuse of discretion" or-- what amounts to the same thing--an "arbitrary and capricious" standard. See Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1471 n. 2 (9th Cir. 1994).

3. The Plan explicitly grants discretion to Blue Shield to determine benefits and interpret the Plan, so the appropriate review is abuse of discretion.

4. In situations where "a plan administrator denies benefits and (1) the wording of the plan confers discretion on the plan administrator and (2) the plan administrator has a conflict of interest," a court should apply an "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest." <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 959 (9th Cir. 2006) (en banc).

5. When adjudicating a claim for benefits, ERISA administrators have a duty to adequately investigate the claim. <u>Booton v. Lockheed Medical Benefit Plan</u>, 110 F.3d 1461, 1463 (1997).

6. The plan administrator must engage in "meaningful dialogue" with the beneficiary. <u>Id.</u>

7. "If the administrator believes more information is needed to make a reasoned decision, they must ask for it." <u>Id.</u>; <u>see</u> <u>also</u> <u>Kunin v. Benefit Trust Life Ins. Co.</u>, 910 F.2d 534, 538 (9th Cir. 1990) (burden is on the administrator to obtain information to make decision).

8. Because Blue Shield did not adequately perform its investigation, the Court views Blue Shield's decision with skepticism.

9. Blue Shield abused its discretion by failing to

adequately to consider Dr. Hollinger's eligibility for a clinical trial for cancer.

10. Remand to the plan administrator is appropriate when it is unclear whether the beneficiary is entitled to benefits. See, e.g., <u>Love v. Nat'l City Corp. Welfare Benefits Plan</u>, 574 F.3d 392, 398 (7th Cir. 2009).

11. The Court finds that it is unclear whether Dr. Hollinger was qualified for a clinical trial under the Plan, and therefore remands to Blue Shield for further proceedings.

**IT IS SO ORDERED.**

DATED: December 11, 2012.

<u>RONALD S.W. LEW</u>
**HONORABLE RONALD S.W. LEW**
Senior, U.S. District Court Judge

10